**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**MARY ANN SPIELBUSCH,**

    **Plaintiff,**

    **v.**

**NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**Case No. 17-CV-2057-JAR**

---

**MEMORANDUM AND ORDER**

Plaintiff Mary Ann Spielbusch seeks review of a final decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under the Social Security Act.[1] Plaintiff alleges error with regard to the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") assessment. Finding no error, the Court affirms the Commissioner's decision.

**I.      Factual and Procedural Background**

Plaintiff applied for disability insurance benefits on January 16, 2014, alleging an onset date of July 11, 2013, due to her fibromyalgia, arthritis, autonomic nervous system affected by unknown virus, dizziness, profuse sweating, racing heart, fluctuating blood pressure, chronic inflammation, chronic pain, hypothyroidism, headaches/migraines, fatigue, chronic orthostatic hypertension, limited mobility in neck, sensitive nerves, and gastroesophageal reflux disease

---

[1] 42 U.S.C. §§ 401–434.

("GERD").[2]  The Commissioner denied Plaintiff's application upon initial review and upon consideration.  Plaintiff timely requested a hearing before an ALJ.  She appeared and testified at a hearing before ALJ Timothy G. Stueve on September 30, 2015.

The ALJ issued an unfavorable decision against Plaintiff on November 19, 2015.  He concluded that Plaintiff was not disabled within the meaning of the Act.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision, and Plaintiff timely filed an appeal with this Court pursuant to 42 U.S.C. § 405(g).

## II.     Standard for Judicial Review

Judicial review under 42 U.S.C. § 405(g) is limited to whether the ALJ's decision is supported by substantial evidence in the record as a whole and whether the ALJ applied the correct legal standards.[3]  The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4]  In the course of its review, the Court may not re-weigh the evidence or substitute its judgment for that of the agency.[5]

## III.    Legal Standards and Analytical Framework

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[6]  An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his

---

[2] R. at 64, 265.

[3] 42 U.S.C. § 405(g).

[4] *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[5] *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

[6] 42 U.S.C. § 423(d)(1)(A); § 416(i); § 1382c(a)(3)(A).

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[7]  The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled.[8]  If the ALJ determines the claimant is disabled or not disabled at any step along the way, the evaluation ends.[9]

The ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  He determined at step two that Plaintiff has the following severe impairments: fibromyalgia, degenerative disc disease, sinusitis, obesity, and stress fracture of the metatarsals.  He determined at step three that Plaintiff's impairments did not meet or equal the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  Continuing, he determined that Plaintiff has the RFC to perform light work, except:

> the individual could occasionally lift 20 pounds and frequently lift or carry 10 pounds; the individual could sit for up to 6 hours, and stand or work for approximately 6 hours in an 8-hour day with normal breaks; the individual is frequently able to climb ramps or stairs; the individual should never climb ladders, ropes, or scaffolds; the individual is frequently able to balance, stoop, kneel, crouch, and crawl; the individual could occasionally tolerate exposure to extreme cold, to extreme heat, and to vibrations; the individual could never tolerate exposure to unprotected moving mechanical parts and unprotected heights.[10]

He determined at step four that Plaintiff was able to perform her past relevant work as an underwriting technician or light semi-skilled work with a specific vocational rating of four.  He then concluded that Plaintiff has not been under a disability, as defined in the Social Security

---

[7] *Id*. § 423(d)(2)(A); § 1382c(a)(3)(B).

[8] *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

[9] *Id*.

[10] R. at 63–64.

Act, from July 11, 2013, until the date of his decision, November 19, 2015.[11] Because he determined Plaintiff was not disabled at step four, the ALJ did not proceed to step five.

Plaintiff challenges the ALJ's RFC and step four findings, arguing that the ALJ erred by: 1) giving considerable weight to Dr. Trowbridge, a state agency physician; while giving little to no weight to her treating physicians' opinions; 2) discounting her treating doctors' opinion because their exam findings were "normal" when she suffers from fibromyalgia, a condition that commonly generates normal test results; 3) failing to re-contact Dr. Ponnuru contrary to Social Security Ruling ("SSR") 96-5p; 4) failing to identify the basic work activities limited by her obesity; 5) failing to include mild restrictions from her anxiety in her RFC; 6) discounting her mother's statements because she is a layperson and related to Plaintiff; and 7) finding her not credible without providing an explanation supported by substantial evidence.

## IV.    Analysis

Plaintiff attacks the ALJ's RFC assessment on various grounds.  "Residual functional capacity consists of those activities that a claimant can still perform on a regular and continuing basis despite his or her physical limitations."[12]  Under SSR 96–8p, an RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence."[13]  The ALJ must also discuss the individual's ability to perform sustained work activities in an ordinary work setting on a "regular and continuing basis" and describe the maximum amount of work-related activity the individual can perform based on evidence contained in the case record.[14]  The ALJ "must also explain how

---

[11] R. at 75.

[12] *White v. Barnhart*, 287 F.3d 903, 906 n.2 (10th Cir. 2001) (citing 20 C.F.R. § 416.945(a),(b),(c)).

[13] SSR 96–8p, 1996 WL 374184, at *7 (July 2, 1996).

[14] *Id.*

any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."[15]  However, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."[16]

## A.    Evaluation of Medical Opinions

### 1.    Standard for Weighing Medical Opinions

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."[17]  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations.[18]  Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[19]

---

[15] *Id.*

[16] *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

[17] 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

[18] *Id.* §§ 404.1527(d), 416.927(d); SSR 96–5p, West's Soc. Sec. Reporting Serv., Rulings 123–24 (Supp. 2008).

[19] *Id.* §§ 404.1527(d)(2–6), 416.927(d)(2–6); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing *Goatcher v. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).

"In general, the opinions of treating sources will be given the greatest weight, those of nontreating sources will be given lesser weight, and those of nonexamining sources will be given the least weight."[20] A treating physician's opinion, however, may be rejected "if it is brief, conclusory, and unsupported by medical evidence."[21]

### 2. The Non-examining Physician's Opinion

Defendant requested Denise R. Trowbridge, M.D., to review Plaintiff's medical records and provide an assessment of Plaintiff's RFC.[22] After reviewing extensive records, Dr. Trowbridge rated Plaintiff's exertional limitations as follows: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for a total of about 6 hours in an 8-hour workday; and unlimited push/pull other than for lift/carry.[23] She said she can frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; but she can never climb ladders, ropes, or scaffolds.[24] She recommended she avoid concentrated exposure to extreme cold, heat, and vibration.[25] She indicated she can withstand unlimited wetness, humidity, and noise.[26] She also said she should avoid all exposure to hazards such as machinery and heights.[27] She concluded that:

> The degree of dysfunction alleged is not [consistent with] the [medical records] in file and would not be expected from the established [medically determinable impairments]. Her exams appear relatively normal, except for obesity and several of her treating physicians have encouraged her to exercise. Giving the claimant

---

[20] *Savino-Nixon v. Astrue*, 479 F. Supp. 2d 1176, 1182 (D. Kan. 2007) (citations omitted).

[21] *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987) (citing *Allison v. Heckler*, 711 F.2d 145, 148 (10th Cir. 1983)).

[22] R. at 885.

[23] R. at 126.

[24] R. at 126–27.

[25] R. at 127.

[26] *Id*.

[27] *Id*.

the benefit of some ongoing symptoms from these established [medically determinable impairments] and some medication effects, it appears she would be limited to lighter work on a sustained basis.

[Medical source opinion] given little weight, as it is lacking in objective support; a full [work-up] for orthostasis, including tilt table testing/echocardiography and Holter monitoring was negative.[28]

The ALJ gave **considerable weight** to Dr. Trowbridge's opinion because "[she] is familiar with the definitions and evidentiary standards used by the agency and her opinion is consistent with the medical evidence as a whole."[29] He adopted Dr. Trowbridge's RFC findings.

Plaintiff argues that Dr. Trowbridge's opinions are not substantial evidence to support the ALJ's decision because: 1) she did not examine or treat Plaintiff, and 2) she is a radiologist with a specialty in oncology, a condition that Plaintiff does not have. The Court disagrees. First, the latter argument is simply specious. Being a specialist in oncology did not disqualify Dr. Trowbridge from giving a medical opinion.

Second, a non-examining physician's opinion is an acceptable medical source that the ALJ must consider.[30] Indeed, in some instances, opinions from state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources.[31] Here, the ALJ did not err by assigning significant weight to Dr. Trowbridge's opinion because it was based on a comprehensive review of the record and it was consistent with the objective medical

---

[28] R. at 129.

[29] R. at 74 (emphasis in original).

[30] *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007)).

[31] Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3 (Soc. Sec. Admin. July 2, 1996) ("In appropriate circumstances, opinions from State agency medical and psychological consultants may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating [source's] medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.").

evidence of Plaintiff's treating and examining physicians.[32]  Dr. Trowbridge's opinion was based

upon the entire record, as opposed to Dr. Ponnuru's opinion, which appears to have been based

only upon his interactions with Plaintiff.[33]  Even when considering the stricter standard set forth

in SSR 96-6p, the Court cannot find that the ALJ improperly weighed Dr. Trowbridge's opinion.

### 3. Treating Physicians

Plaintiff argues the ALJ improperly weighed her treating physicians' opinions; namely

Drs. Ponnuru, Neustrom, Dennis, Bondi, Koenig, Williams, and Minocha.  Again, the Court

disagrees.

### a) Dr. Ponnuru

Harrish Ponnuru, M.D., is one of Plaintiff's treating physicians.  Plaintiff sought

treatment from him for, *inter alia*, fatigue, racing heart, and near syncope (fainting).[34]  On April

24, 2014, Dr. Ponnuru provided a RFC assessment that was significantly different from that of

Dr. Trowbridge's.[35]  He opined that Plaintiff could sit less than one hour at a time; she could sit

less than one hour total in an eight-hour workday; she could stand/walk less than an hour at one

time; she could stand/walk less than an hour total in an eight-hour workday; and she needed to

lie down over four hours total in an eight-hour work day.[36]  The ALJ gave little to no weight to

Dr. Ponnuru's opinions because his examinations of Plaintiff were normal, Plaintiff's holter

---

[32] *See Hanback v. Comm'r, Soc. Sec. Admin.*, 581 F. App'x. 840, 841 (11th Cir. 2014) ("The ALJ did not err by assigning 'some weight' to the opinion of a non-examining physician because the non-examining physician was the only medical source to opine directly on [claimant's] physical [RFC] and that physician's opinion was consistent with the objective medical evidence of [claimant's] treating and examining physicians.").

[33] *See* discussion *infra* in Treating Physicians section.

[34] R. at 963.

[35] Ex. 10F, R. at 794–78.

[36] R. at 966.

monitor and tilt tests were normal, and a cardiologist found no cardiac etiology for her impairments.[37]

Plaintiff claims two errors with respect to Dr. Ponnuru's opinions: 1) the ALJ failed to re-contact him as required by SSR 96-5; and 2) the ALJ erroneously rejected his opinions for the stated reason that his examination findings were normal when they were not. The Court finds these arguments unpersuasive.

As to the first error, Plaintiff argues that because Dr. Ponnuru opined that Plaintiff was not able to work presently, he trespassed on an issue reserved for the Commissioner, which triggered the ALJ's duty to re-contact Dr. Ponnuru, citing SSR 96-5.[38] Plaintiff, however, relies upon an outdated regulation.[39] That regulation was changed in 2012 and no longer requires that an ALJ first re-contact a treating source to resolve an inconsistency or insufficiency in the evidence that source provides to the Social Security Administration.[40] If the ALJ determined that the evidence was inconsistent or insufficient to permit him to determine whether Plaintiff was disabled, he could have taken several different actions to enhance the record, including re-contacting his medical sources.[41] But Plaintiff fails to show that inconsistent or insufficient evidence prevented the ALJ from determining whether she was disabled. The ALJ therefore did not have a duty to re-contact Dr. Ponnuru.

_____

[37] R. at 72.

[38] Doc. 9 at 32.

[39] *Jones v. Colvin*, No. 14-1311-JWL, 2015 WL 4478628 (D. Kan. July 22, 2015), *aff'd*, 647 F. App'x 878, 882, n.1. (10th Cir. 2016) (noting plaintiff cited an outdated regulation on the duty to re-contact).

[40] *Jones*, 2015 WL 4478628, at *5 (citing *How We Collect and Consider Evidence of Disability*, 77 Fed. Reg. 10,651 (Feb. 23, 2012) (effective March 26, 2012)).

[41] *See* 20 C.F.R. § 404.1520b(c) (2012).

As to the second error, Plaintiff points out that there are no tests for fibromyalgia and that normal test results are common for fibromyalgia sufferers. She thus argues that the ALJ's reliance upon "normal" exams and tests to discount Dr. Ponnuru's opinions was misplaced. She also claims that the ALJ ignored evidence of abnormal results such as the presence of a small nasal polyp, elevated eosinophils and immunoglobulin E, positive test result for infectious mononucleosis, visible greater girth in the right lower extremity than the left, varying blood pressure, and hypertensive throughout examination. The Court disagrees. The ALJ acknowledged the evidence regarding Plaintiff's fibromyalgia and these abnormal results. But a diagnosis of fibromyalgia does not mean Plaintiff's RFC is limited as Dr. Ponnuru opines. Moreover, Dr. Ponnuru's restrictions were based on his diagnosis for near syncope and autonomic nervous system dysfunction, not fibromyalgia.[42]

Although there is some evidence which may support contrary findings, the Court will not displace the ALJ's choice between two fairly conflicting views, even though the Court could make a different choice had the matter been before it *de novo*.[43] In this case, two doctors opined directly on Plaintiff's RFC: Drs. Ponnuru and Trowbridge. Dr. Ponnuru's restrictions were inconsistent with his treatment notes. The ALJ essentially found that Dr. Ponnuru's restrictions were based primarily on Plaintiff's subjective complaints without support in his treatment notes. That finding is supported by substantial evidence in the record. Despite finding Plaintiff's cardiac functioning, respiratory functioning, and neurological functioning consistently normal, he gave extreme limitations.[44] And contrary to his opinions on near syncope, Plaintiff's holter

---

[42] R. at 969, 1023,

[43] *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (quoting Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)).

[44] R. at 834, 837, 893, 896-897, 900, 903.

monitor and tilt tests were normal.  Moreover, Dr. Trowbridge's review of Dr. Ponnuru's records

and explanation why he gave little weight to Dr. Ponnuru's opinion provided the ALJ an

additional basis to assign Dr. Ponnuru's opinions little to no weight.[45]  The Court finds

substantial evidence supports the ALJ's decision to discount Dr. Ponnuru's opinions.

### b)  Dr. Koenig

Christopher Koenig, M.D., is a rheumatologist who treated Plaintiff's fibromyalgia.  The

ALJ discussed Dr. Koenig's records in three paragraphs:

> The claimant treated with Christopher Koenig, M.D. at Rheumatology
> Consultants Chartered from December 2012 to January 2015 (Exhibits 5F, 30F).
> Dr. Koenig initially reported the claimant's variable widespread discomfort was
> related to fibromyalgia syndrome.  Dr. Koenig also reported that while the
> claimant still had some left sided cervical pain, her neuropathic symptoms that
> extended into her right upper extremity had resolved.  Additionally, Dr. Koenig
> reported the claimant's slow to heal insufficiency fraction of her right foot was
> fully healed and she could walk comfortably.  He noted that while she had chronic
> fatigue, she tried to remain active and could swim without pain aggravation
> (Exhibit 5F, 8).  Dr. Koenig assessed chronic cervical myofascial pain,
> osteopenia, and right lower extremity DVT [deep vein thrombosis].[46]
>
> On a follow up visit over one year later, Dr. Koenig reported the claimant had
> recently been seen for an enigmatic illness and was diagnosed with fibromyalgia.
> The claimant was encouraged to exercise in addition to taking Flexeril,
> Gabapentin, Venlafaxine, and Tramadol.  Dr. Koenig reported the labs performed
> at the Mayo Clinic were all normal, and there was no evidence of an underlying
> systemic inflammatory process.  Despite advice to the contrary, she was not seen
> again for another 12 months (Exhibits 5F, 6, 30F, 1).  Dr. Koenig noted
> fibromyalgia and cervical spondylosis were added to the claimant's previously
> assessed impairments.[47]
>
> In 2015, Dr. Koenig reported the claimant was wearing an orthotic boot as needed
> for public walking.  Dr. Koenig reported the claimant was no longer working, she
> stopped taking Venlafaxine due to the cost, and wanted to know if she could take
> Flexeril during episodes of anxiety, headaches, and chest tightness.  Dr. Koenig

---

[45] R. at 129 ("[Medical source opinion]: given little weight, as it is lacking in objective support; a full
[work-up] for orthostasis, including tilt table testing/echocardiography and Holter monitoring was negative.").

[46] R. at 67.

[47] *Id.*

noted the claimant could take Hydrocodone-Acetaminophen as needed for severe
pain and Flexeril as needed for pain (Exhibit 30F, 1, 3). Dr. Koenig also noted
she weighed between 215 and 234 pounds with a BMI between 29.36 and 31.96
(Exhibits 5F, 6, 30F, 3).[48]

After the ALJ issued his decision, Dr. Koenig wrote a letter, stating, in pertinent part:

> I have provided rheumatology care to Ms. Mary Spielbusch since September
> 2009. . . Mary was diagnosed with chronic neck pain and cervical myofascial
> pain. In January 2010, I expanded the diagnosis to include fibromyalgia
> syndrome (central pain sensitization) based on diffuse myalgias and expanding
> skeletal pain involving the neck, thoracic spine, and shoulder girdles. Later in
> 2010, she developed additional symptoms of central pain sensitization including
> daily headaches, worsening widespread pain to non-noxious stimuli, and
> nonrestorative sleep. From 2009-2011, management included medications for
> central pain sensitization (NSAIDS, Muscle Relaxers, and Anti-epileptics) and
> massage therapy.
>
> In December 2011, Mary developed a stress fracture in her right foot complicated
> by a deep venous thrombosis from immobilization and the AFO [ankle foot
> orthosis]. Discontinuation of Meloxicam on anticoagulation caused worsening
> pain. She began using Hydrocodone or Tramadol to manage the pain off
> Meloxicam. Venlafaxine was also added for pain control. Her central pain
> sensitization remained symptomatic despite these measures.
>
> Mary intermittently received care from pain management over several years.
> Interventions included trigger point injections, facet injections, and
> radiofrequency ablation. These interventions did not produce substantial or·
> enduring symptomatic benefit. Repeated C-spine imaging has remained normal.
>
> Mary has received a medical evaluation through the Mayo Clinic. The Mayo
> Clinic doctors confirmed central pain sensitization and recommended
> continuation of standard therapies. No other problems existed that explained her
> chronic musculoskeletal symptoms.
>
> * * *
>
> . . . Mary recently presented for annual follow-up. Since her last appointment,
> she developed chronic regional pain syndrome involving the right foot. . . .
>
> I do not believe Mary can work with the chronic regional pain syndrome affecting
> her right foot. She does need comprehensive multidisciplinary management

---

[48] R. at 70.

including formal [physical therapy] and cognitive behavior therapy to improve
this process. . . .  I believe her diagnoses are correct.[49]

The Appeals Council considered Dr. Koenig's letter and concluded that it, along with additional

medical source statements, did not provide a basis for changing the ALJ's decision.[50]  And

because the diagnosis for chronic regional pain syndrome was assessed after the ALJ's decision,

the Appeals Council said "it does not affect the decision about whether you were disabled

beginning on or before November 19, 2015."[51]

The Court sees no problems with the ALJ's evaluation of Dr. Koenig's records.  Plaintiff

has not specifically identified any issues other than arguing that his opinions should be given

more weight given his treating physician status.  But Dr. Koenig did not give an opinion as to

Plaintiff's restrictions and limitations to work before the ALJ issued his decision.  And

Dr. Koenig's letter proves that a diagnosis of fibromyalgia does not automatically translate into

an inability to work.  He diagnosed Plaintiff with fibromyalgia in 2010, yet she worked until July

2013.[52]  The Court finds no error with respect to Dr. Koenig's opinion.

### c)  Dr. Neustrom

Plaintiff saw Mark Neustrom, D.O., for her allergies from January 2013 to May 2014.

Dr. Neustrom's records indicate that Plaintiff experienced sinus pressure and postnasal drainage

after receiving allergy injections, but she had no sinus infection in the previous six months and

her recurrent sinusitis and asthma were improved.  In 2014, Dr. Neustrom noted Plaintiff stopped

allergy injections due to arthralgia (joint pain), her symptoms were less pronounced during the

---

[49] R. at 1180–81.

[50] R. at 2.

[51] *Id.*

[52] R. at 60.

winter, and she had mild seasonal allergies. After summarizing his treatment records, the ALJ wrote:

> Dr. Neustrom provided a medical source statement in November 2013 (Exhibit 6F). Dr. Neustrom opined the claimant's current physical state made it difficult for her to work consistently without interruption. However, Dr. Neustrom also opined that with the claimant's current treatment of Budesonide, the claimant's symptoms should improve significantly in the next 2 weeks (Exhibit 6F, 26). The undersigned gives Dr. Neustrom's opinion no weight as his examination of the claimant was normal.[53]

Plaintiff argues that Dr. Neustrom's findings were not normal as he found she had a small nasal polyp. But that single polyp does not warrant reversal because Dr. Neustrom opined that it would improve significantly in the next two weeks with Budesonide. Plaintiff's medical records indicate that her allergies, asthma, and sinusitis were controlled or improved by medication. And as the ALJ noted, "Dr. Neustrom had reported Plaintiff had no significant nasal congestion or sinus pressure, she took Nasonex and Allegra as needed, and her recurrent sinusitis and asthma were improved (Exhibit 6F, 37). By the end of 2013, Dr. Neustrom reported the claimant had only one or two treated sinus infections in the previous 12 months."[54] These reported treatment and improvement are inconsistent with Plaintiff's statement regarding the severity of her symptoms. The Court finds no error with discounting Dr. Neustrom's opinion.

### d) Dr. Minocha

Kiran Minocha, M.D., was Plaintiff's primary care physician. She treated Plaintiff for mononucleosis. The ALJ gave no weight to Dr. Minocha's opinions as she only provided temporary restrictions because of Plaintiff's mononucleosis.[55] Dr. Michoa opined that Plaintiff's condition was expected to last only two weeks to six months and estimated Plaintiff could return

---

[53] R. at 73.

[54] R. at 68.

[55] R. at 71–72.

to work without restrictions in two months provided Plaintiff rest, hydrate, and maintain adequate nutrition.[56] Because the limitations were temporary, the Court finds no error with discounting Dr. Minocha's opinions.[57]

### e) Dr. Dennis

Damon Dennis, D.C., is Plaintiff's chiropractor. After the ALJ issued his decision, Dr. Dennis submitted a letter indicating that he has provided back and joint care for Plaintiff over 15 years; she suffered from various problems that caused swelling throughout her body; she is in pain twenty-four hours a day causing her to be on bedrest for extended periods of time; she recently has been diagnosed with Complex Regional Pain Syndrome; she continues to be unable to work; and this will not change in the near future.[58] The Appeals Council considered Dr. Dennis' letter and concluded that it, along with additional medical source statements, did not provide a basis for changing the ALJ's decision.[59]

Because Dr. Dennis' opinion is brief, conclusory, and unsupported in the record, the Appeals Council did not err in discounting or rejecting his opinion. Moreover, his opinion is inconsistent with Dr. Roberts', who noted that chiropractic management and epidural injections provided relief and helped Plaintiff's neck pain, while trigger point injections, facet blocks, and

---

[56] R. at 1030, 1046.

[57] 42 U.S.C. § 423(d)(1)(A) (impairment must last or be expected to last not less than 12 months); *Barnhart v. Walton*, 535 U.S. 212 (2002) (holding agency's interpretation of statutory definition of disability as requiring that a claimant's inability to engage in substantial gainful activity last, or be expected to last, for at least 12 months, was lawful); *Petty v. Berryhill*, No. 17-5129, 2017 WL 3727319, at *2 (W.D. Wash. Aug. 8, 2017), report and recommendation adopted, 2017 WL 3726055 (W.D. Wash. Aug. 28, 2017) (stating "an ALJ may reject opinions of temporary limitations because they have little bearing on a claimant's long-term functioning").

[58] R. at 1178–79.

[59] R. at 2.

radiofrequency ablation helped with her fibromyalgia.[60]  The Court finds no error with

discounting Dr. Dennis' opinions.

f)    **Dr. Bondi**

Plaintiff saw Laurel Bondi, DPM, for her right foot pain.  The ALJ discussed Dr. Bondi's

records in two paragraphs:

> The claimant treated with Laurel Bondi, DPM from February 2012 to April 2015
> (Exhibit 25F).  The claimant stated her foot pain started in June 2011.  She stated
> this pain was intermittent and located on the top of her right foot.  While her pain
> was aggravated with standing, it was relieved with ice and rest.  Dr. Bondi
> reported the claimant previously used a controlled ankle movement (CAM)
> walker and ice packs.  The claimant underwent an MRI which was negative.
> However, she also underwent a bone scan which was positive for activity in the
> third metatarsal of the right foot (Exhibit 25F, 22).  Dr. Bondi noted in March
> 2012 and May 2012 that the claimant received a bone stimulator and she was to
> continue her prescribed medications including Gabapentin, Cyclobenzaprine, and
> Hydrocodone-Acetaminophen (Exhibit 2SF, 15, 17, 23).  Dr. Bondi assessed
> stress fracture of the metatarsals, and other osteoporosis.[61]

> Dr. Bondi noted in April [2015] that she had not seen the claimant since January
> 2013 although the claimant contacted her in 2014 to obtain a bone stimulator for
> her alleged refractured right foot.  The claimant alleged she had pain in the ball of
> [her] right foot, which was aggravated with walking, although it was relieved with
> using a CAM walker and compression socks.  Dr. Bondi noted the claimant was
> advised to move ice packs to her ankle, to keep weight off her right foot, and to
> elevate it as much as possible.  Dr. Bondi also noted the claimant weighed 274
> pounds with a BMI of 38.21 and she advised the claimant to use a CAM walker
> with extended weight bearing, to use stiff soled socks at home, and to use a bone
> stimulator for her fractured metatarsals (Exhibit 25F, 1, 2, 4, 5).[62]

Although the ALJ summarized Dr. Bondi's treatment records, he did not weigh her

opinion as she did not give one regarding Plaintiff's ability to work.  After the ALJ issued his

decision, Dr. Bondi wrote a letter, stating:

---

[60] Ex. 15F, R. at 823.

[61] R. at 67.

[62] R. at 70.

Mary Spielbusch first presented to my office in early 2012, and has continued to see me on an intermittent basis since then for ongoing complaint of right foot pain. When I initially evaluated Mary, she had already been treated by two other podiatrists for stress fractures of the right foot; and had developed a blood clot in her right leg due to immobilization for treatment of the fractures. I tested Mary for bone density and Vitamin D levels, and objectively confirmed that she had osteopenia and Vitamin D deficiency. Mary's medical history included [the] fact that she had been on intermittent corticosteroid therapy for allergies and asthma, as well as Nexium for chronic reflux since the age of 13. Both of these medications were factors in reducing her absorption of calcium and Vitamin D, as well as directly contributing to bone loss, particularly in the case of corticosteroid use. Due to Mary's previous DVT of the right leg, I advised her to use shoe wear with a thicker, more rigid sole, in order to reduce bending force on the forefoot without fully immobilizing her leg; and to avoid activities that produce either sudden, increased load or repetitive stress on the feet. I also advised the use of a bone stimulator, to help heal the weakened metatarsal bones.

Mary's condition improved somewhat with these measures, although she was never totally without foot pain over the course of the next several years. Mary contracted a viral illness during this time period as well, and was placed on increased doses of oral corticosteroids for an extended period of time; and continued to take Nexium for her reflux; again, both factors that complicated her ability to fully heal stress fractures of the right foot, due to impaired absorption of nutrients.

At Mary's most recent visit to my office on 12/22/15, I observed that the pain and swelling in her right foot and leg had dramatically increased, her foot was cool to the touch, cyanotic in color and she had painful limitation of movement of the foot and ankle. Mary related that her foot pain severely restricted her mobility and her ability to drive, as she could not walk, stand or even sit with the right foot dependent for more than 10 minutes at a time, due to increased pain and swelling of the right lower limb. Elevation of her foot for several hours at a time was required to reduce pain and swelling once it developed during the course of a day. Mary's foot pain was disrupting her sleep as well, unless she elevated her foot at least 2 feet above hip level.

A radiographic exam revealed the appearance of a patchy demineralization pattern throughout the right foot. All of these objective findings were consistent with the development (sic) of complex regional pain syndrome (CPRS) of the right foot, and I have counseled Mary on appropriate treatments that she can do on her own (intermittent heat and gentle massage, passive and active range of motion exercises, use of compression stockings to control edema). She no longer has insurance coverage, making the option of formal physical therapy prohibitive due to expense.

Mary's foot condition has been a challenging problem, due to many contributing factors that reduce her ability to heal and increase the bone density of the metatarsals of the right foot. Her previous DVT prohibits the use of long term immobilization of the right foot and leg; her long history of treatment for asthma and reflux has required the use of medications that are known to cause bone loss and impair absorption of essential nutrients required for bone strength. Finally, her recent development of CPRS is contributing to a vicious cycle of pain, immobility and reduced use of the right lower limb.[63]

The Appeals Council considered Dr. Bondi's letter and concluded that it, along with additional medical source statements, did not provide a basis for changing the ALJ's decision.[64]

The Court will disregard Dr. Bondi's letter to the extent it discusses examinations and diagnosis after the date of the ALJ's decision. This leaves the first two paragraphs of the letter for consideration. The Court agrees with the Appeals Council that Dr. Bondi's letter does not provide a basis for reversal of the ALJ's decision. Dr. Bondi's opinion letter is inconsistent with her own treatment during the relevant period—she recommended only a CAM walker for extended weight bearing, stiff-soled shoes at home, and use of a bone stimulator for 30 to 60 days.[65] The treatment time-frame indicates this impairment was not expected to last more than 12 months. The record also indicated that during her physical exams, doctors routinely noted Plaintiff had a "normal gait" throughout the period at issue. The Court finds no error with respect to Dr. Bondi's opinion.

### g) Dr. Williams

Plaintiff saw Theodore Williams, M.D., four times from August 2014 to August 2015. The ALJ summarized Dr. Williams' records as follows:

The claimant treated with Theodore Williams, MD at College Park Family Care Center from August 2014 to August 2015 (Exhibit 26F). Dr. Williams initially

---

[63] R. 1176–77.

[64] R. at 2.

[65] R. at 1056.

reported the claimant did not feel well and thought she had a sinus infection. Dr. Williams reported the claimant weighed 237 pounds with a BMI of 32.17. Dr. Williams assessed sinusitis (Exhibit 28F, 10). Also during follow appointments, the claimant again alleged she had a possible sinus infection, which presented with severe cold symptoms including cough, congestion, nasal discharge, fever, and sore throat. Dr. Williams reported the claimant was advised to increase her fluid intake. The claimant was prescribed Augmentin and over-the-counter Tylenol or Motrin. At this time, the claimant weighed between 251 and 253 pounds with a BMI between 34.04 and 34.31 (Exhibit 28F, 4, 5, 6).[66]

After the ALJ issued his decision, Dr. Williams wrote a letter, stating, in pertinent part:

> I have seen this patient since 2014 and after reviewing her records she has a diagnosis list which includes complex regional pain syndrome of the right foot, chronic regional pain syndrome, viral induced autonomic dysfunction, fibromyalgia and eosinophilic gastroenteritis.

> After observing this patient in the office (sic) in reviewing records from previous physicians (sic) I concur with her diagnosis of the above. I (sic) this patient is unable to work in any capacity due to the challenges of her diagnoses. In the office the patient exhibits hypertension but hypotension with position changes and sweatiness and palpations. She is limited in ambulation given her foot injury and other gastrointestinal issues (needing to be close to a bathroom).

> * * *

> She experiences daily migraine headaches neuralgias involving her arm and shoulders. She is unable to drive a car due to her right foot impairment.[67]

The Appeals Council considered Dr. Williams' letter and concluded that it, along with additional medical source statements, did not provide a basis for changing the ALJ's decision.[68]

Plaintiff argues Dr. Williams confirmed her diagnoses included viral induced autonomic dysfunction, yet the ALJ ignored this. A diagnosis, however, does not mean an inability to work. It provides no indication as to the severity of an impairment, if any. In any case, the ALJ recognized that Plaintiff claimed she had an autonomic nervous disorder and sought treatment

---

[66] R. at 69.

[67] R. at 1182.

[68] R. at 2.

for it.[69]  Additionally, Dr. Williams' opinion is inconsistent with his own exam findings during

the period at issue.  On August 28, 2014, his exam findings regarding Plaintiff were: no acute

distress, well-developed, well-nourished; neck supple, full range of motion, no cervical

lymphadenopathy, no thyromegaly; lungs clear to auscultation bilaterally; and heart rate and

rhythm regular.[70]  His exam findings on November 11, 2014 and May 18, 2015 were also normal

for nose and throat inspection, cardiac functioning, and respiratory functioning.[71]  Plaintiff points

to nothing in the record to warrant reversal of the ALJ's decision with respect to Dr. Williams'

opinion.

### B.    Limitations Due to Obesity

Plaintiff contends the ALJ's RFC assessment did not include any functional limitations

related to her obesity.  She argues that merely stating that he had considered her obesity was

insufficient.  She says the ALJ failed to assess the effect obesity had on her ability to perform

routine movement and physical activity within the work environment as required by SSR 02-1p,

paragraph 8.  The Court rejects these arguments for several reasons.

First, the RFC assessment did include limitations related to Plaintiff's obesity.  The ALJ

gave significant weight to Dr. Trowbridge, who concluded that the degree of alleged dysfunction

was inconsistent with her medically determinable impairments "except for obesity," but

"[g]iving [Plaintiff] the benefit . . . it appears [Plaintiff] would be limited to lighter work on a

sustained basis."[72]  This statement indicates that the limitation of lighter work, rather than a full

range of work, was due in part to Plaintiff's obesity.

---

[69] R. at 64, 71, and 73.

[70] R. at 1110.

[71] R. at 1104, 1108.

[72] R. at 129.

Second, when an ALJ states that he has considered all the evidence, the general practice in the Tenth Circuit "is to take a lower tribunal at its word when it declares that it has considered a matter."[73]  At step three, the ALJ found there was no current listing for obesity and stated "[he had] considered the potential exacerbating effects of obesity on the claimant's other impairments when evaluating the listings, and at every state of the sequential evaluation (SSR 02-01p)."[74]  The Court sees no reason to depart from this general practice in this case.

Third, from the ALJ's references to the evidence, he did consider Plaintiff's obesity in the RFC assessment.  SSR 02–1p states that obesity may cause limitations of various functions, including exertional, postural and social functions.[75]  Therefore, an assessment should also be made of the effect obesity has upon the claimant's ability to perform routine movement and necessary physical activity within the work environment.[76]  Here, the ALJ referenced Plaintiff's height and weight, and noted her weight gain and body mass index in various parts of his opinion.  He also expressly noted the objective and clinical findings regarding Plaintiff's ability to ambulate.[77]  He specifically noted that "[r]ange of motion was full throughout."[78]  From the physical examination in May 2014, the ALJ considered Dr. Roberts' orthopedic observations that: 1) Plaintiff did not use an assistive device; 2) she had no problem getting on and off the examining table; and 3) she had no difficulty with hopping, squatting or arising from a seated

---

[73] *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)).

[74] R. at 63.

[75] Soc. Sec. Rul. 02–1p, 2002 WL 32255132 at *7.

[76] *Id*.

[77] R. at 66.

[78] *Id*., s*ee also* R. at 509 (normal range of motion), 540 (same), 578, 608, 634, 657, 721, 728, 745, 755, 762, 814, 820, 824, 1060, 1104, 1108, 1115, and 1134.

position.[79]  The ALJ found that "[t]he claimant has not exhibit[ed] any gross anatomical deformity, chronic joint pain, or stiffness that resulted in an ability to ambulate effectively or an inability to perform fine and gross movements.  Additionally, the claimant has not had back issues characterized by neuro-anatomic distribution of pain, limitation of motion or motor."[80] Given these findings, the Court concludes that the ALJ followed the directives of SSR 02-1p. Even if the Court assumed that the ALJ did not consider the effects of obesity, Plaintiff has shown no harm resulting from that alleged error because she points to no record evidence demonstrating limitations greater than those assessed by the ALJ that are from the effects of her obesity.[81]

### C.    Limitations Due to Anxiety

Plaintiff also contends the ALJ's RFC assessment failed to include any limitations related to her anxiety.  She argues that even if her anxiety was non-severe, the ALJ acknowledged her anxiety caused mild limitations to her activities of daily living, social functioning, and concentration, persistence, or pace; and thus, the ALJ should have included these mild limitations in the RFC.[82]

Plaintiff correctly recites that all medically determinable impairments, including non-severe impairments, must be taken into account in assessing a claimant's RFC.[83]  The ALJ, however, recognized this obligation and met it.  The ALJ applied the "special technique" in

---

[79] R. at 66, 826.

[80] R. at 63.

[81] *See Hansel v. Berryhill*, No. 16-1181-JWL, 2017 WL 1550241, at *3 (D. Kan. May 1, 2017) (finding plaintiff has shown no error in the ALJ's consideration of obesity after noting plaintiff points to no record evidence demonstrating limitations greater than those assessed by the ALJ).

[82] Doc. 9 at 36.

[83] 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *Wells v. Colvin*, 727 F.3d 1061, 1064 (10th Cir. 2013) (discussing "special technique" prescribed by regulations to evaluate the effect of a claimant's mental impairments on her ability to work).

dealing with Plaintiff's untreated anxiety.[84]  He rated the degree of functional limitations in the

first three broad functional areas as mild and concluded that "[Plaintiff's] medically determinable

mental impairment of anxiety also does not cause more than minimal limitation in [her] ability to

perform basic mental work activities and is therefore non-severe."[85]  In support of this

conclusion, the ALJ discussed Drs. Neufeld, Schulman, and Wilkinson's findings.  Dr. Neufeld

conducted a psychological consultative examination of Plaintiff in May 2014 and concluded

"[her] overall performance on exam tasks did not indicate any psychological difficulties that

would interfere with her ability to adequately understand, remember, and carry out complex

instructions; to sustain concentration, persistence, and pace in a work setting; or to maintain

appropriate social interactions with co-workers, supervisors, and the public."[86]  Dr. Schulman's

RFC report noted that "[Plaintiff did] not allege mental [problems]" and "there [was] nothing in

the file to warrant limitations."[87]  Dr. Wilkinson affirmed the medical evidence did not support

any psychologically based limitations.[88]  Plaintiff offers no evidence to contradict these findings.

She also fails to explain specifically what additional limitations were needed based on her

anxiety.  For these reasons, the Court finds no error with respect to the ALJ's RFC and Plaintiff's

anxiety.

### D.       Credibility Determination

Plaintiff contends the ALJ has not given a good reason for finding her not credible.  She

argues that an ALJ may not rely upon gaps in treatment or inconsistency in taking medications as

---

[84] *See* 20 C.F.R. §§ 404.1520a, 416.920a.

[85] R. at 61–62.  Because Plaintiff experienced no episodes of decompensation, the ALJ simply noted "no" for fourth functional area.

[86] R. at 62, 107.

[87] R. at 63, 110–11.

[88] R. at 63, 124–25.

grounds to discredit her without considering whether the treatment would restore her ability to work; whether the treatment was prescribed; whether the treatment was refused; and whether the refusal was without a justifiable excuse.[89]  She also argues that a lack of objective evidence is not determinative of her credibility.  The Court finds these arguments do not justify a departure from the deference usually accorded an ALJ's credibility determination.[90]

It is well-established that a lack of objective medical evidence cannot be the sole basis for discounting a claimant's subjective complaints.[91]  The ALJ, however, did not solely rely upon a lack of objective evidence to find Plaintiff not entirely credible.  The ALJ expressed at least four other reasons to discount Plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms: 1) the clinical signs also did not support a more restrictive RFC; 2) her medical treatment history with various doctors reflected gaps in treatment or relatively simple treatment such as remain active, exercise, relieve foot pain with ice, elevation, and rest; diet; or increase fluid intake; 3)  her medication records showed she was not always consistent in using these medications and also had moderate success controlling her symptoms with use of over the counter medication; and 4) no medical doctor has diagnosed any medical reason for the level of inactivity she alleges or the severity of the symptoms she alleges.[92]  Lack of objective

---

[89] Doc. 9 at 37.

[90] *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994) (noting appellate courts will usually defer to the ALJ on matters involving witness credibility).

[91] *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987) (finding the ALJ is required to consider evidence beyond laboratory and test results whenever a loose nexus is established between the pain-causing impairment and the pain alleged).

[92] R. at 65–71.

medical evidence is a legitimate and relevant factor to be considered so long as it is not the sole reason for discounting a plaintiff's credibility.[93]  That is the case here.

As for the ALJ's reliance upon Plaintiff's alleged gap in treatment and her inconsistency in taking her medications, the Court agrees that before he may rely upon these reasons, he should consider the four *Frey* factors: 1) whether the treatment at issue would restore claimant's ability to work; 2) whether the treatment was prescribed; 3) whether the treatment was refused; and, if so, 4) whether the refusal was without justifiable excuse.[94]  The ALJ did not do so.  The Court finds this error harmless because the balance of the ALJ's summary and evaluation of the evidence and his credibility findings are supported by substantial evidence in the record.[95]

### E.    Evaluation of Third-Party Lay Opinion

Plaintiff argues the ALJ's RFC determination is not supported by her mother's function report.  This is true, but unavailing because other, substantial evidence supports the ALJ's decision.[96]

Equally unavailing is any argument that the ALJ erred in discounting this function report. Plaintiff's mother, who resides with Plaintiff, stated that she provided full-time care to Plaintiff,

---

[93] *Huling v. Colvin*, No. 13-1350-JWL, 2014 WL 5465303, at *3 (D. Kan. Oct. 28, 2014) (noting lack of objective evidence to corroborate the severity of allegations of pain is, by itself, insufficient to reject Plaintiff's allegations of pain, but it may be a factor in the ALJ's credibility determination).  *See also Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993) (noting objective evidence, or the lack thereof, is a factor in step three of the *Luna* framework, wherein the decision maker is to consider "all the evidence, both objective and subjective," in credibility determination).

[94] *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987).

[95] *McDonald v. Astrue*, 492 F. App'x 875, 885 (10th Cir. 2012) (affirming the ALJ's credibility determination because the ALJ considered other relevant evidence along with the objective medical evidence); *Branum v. Barnhart*, 385 F.3d 1268, 1274 (10th Cir. 2004) ( "While we have some concerns regarding the ALJ's reliance on plaintiff's alleged failure to follow a weight loss program and her performance of certain minimal household chores, we conclude that the balance of the ALJ's credibility analysis is supported by substantial evidence in the record"); *Dorrough v. Colvin*, No. 12-4025-JWL, 2013 WL 4766804, at *11 (D. Kan. Sept. 4, 2013) (finding the ALJ's failure to apply the *Frey* test harmless because substantial evidence in the record supported the ALJ's decision).

[96] *See* discussion *supra* on evaluation of medical opinions.

including preparing all meals for Plaintiff, doing all household chores, and caring for Plaintiff's two dogs, two horses, and two aquariums.[97]  She also stated that Plaintiff was unable to work due to her fibromyalgia and autonomic nervous disorder.  The ALJ gave little weight to this report because: 1) it was a lay opinion based upon casual observation rather than objective medical examination and testing; 2) it was potentially influenced by family loyalties; and 3) it did not outweigh the accumulated medical evidence.[98]  Plaintiff suggests layman status and family bias are not legitimate reasons to reject her mother's report because every third-party report from a family member would have these issues, rendering the regulations that require the ALJ to consider these reports superfluous.  But Social Security Ruling 06–03p states, in part, that other source opinion evidence, such as those from spouses, parents, friends, and neighbors, should be evaluated by considering the following factors: (i) nature and extent of the relationship; (ii) whether the evidence is consistent with other evidence; and (iii) any other factors that tend to support or refute the evidence.[99]  Casual observation and familial ties are thus proper reasons for discounting a third-party function report.[100]  And even if they were not, the ALJ provided a third legitimate reason to discount the third-party report — it was inconsistent with the accumulated medical evidence.[101]  The Court finds no error with respect to the third-party function report.

---

[97] Ex. 10E, R. 304–11.

[98] R. at 71.

[99] Soc. Sec. Rul. 06–03p, 2006 WL 2329939, at *5–6.

[100] *Croley v. Colvin*, No. 12-1101-JWL, 2013 WL 615564, at *6 (D. Kan. Feb. 19, 2013) ("[Loyalties to family and opinion not outweighing the accumulated medical evidence] are precisely the two factors specifically recommended by SSR 06–03p for evaluating lay opinions"); *Jackson v. Colvin*, No. 12-1118-EFM, 2013 WL 6440265, at *6 (D. Kan. Dec. 9, 2013) (finding casual observation and friendship proper reasons to assign little weight to two third-party function reports).

[101] *See Croley*, 2013 WL 615564, at *10 (affirming ALJ's giving "little weight" to third party function report completed by plaintiff's mother because it was a lay opinion not based on medical evidence, it was based on family loyalties, and it did not outweigh the other medical evidence); *Jackson*, 2013 WL 6440265, at *6 (noting nearly identical language recently has been upheld by other district courts as proper).

**V.     Conclusion**

The ALJ's RFC and credibility determinations are supported by substantial evidence.

Plaintiff has not shown that the ALJ's decision is inconsistent with the Social Security Act,

regulations, and applicable case law.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's decision denying

Plaintiff disability benefits is AFFIRMED.

**IT IS SO ORDERED.**


Dated: <u>October 5, 2017</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
